IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DWAYNE WHITE, | § | |
| | § | |
| Defendant Below, | § | No. 467, 2019 |
| Appellant, | § | |
| | § | Court Below:  Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1710006768 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:  September 30, 2020
Decided:  December 10, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Michael W. Modica, Esquire (*argued*), Wilmington, Delaware for Appellant.

Andrew J. Vella, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Dwayne White faces a lengthy sentence of incarceration at Level V followed by various levels of probation after a jury convicted him of twenty-one felony charges. On appeal, White challenges his conviction and sentence on a number of grounds that were not raised in the proceedings below. In his first two claims of error, White contends that several of the counts of which he was convicted and separately sentenced merge under the Double Jeopardy Clauses of the Delaware and United States Constitutions. Third, White contends the trial court committed plain error by placing the accomplice liability instructions at the end of the instructions for the felony conspiracy offenses. Fourth, White alleges that his conviction for conspiracy to commit Drug Dealing Cocaine is invalid because it relies on an indictment containing a numbering error. Fifth, White contends the trial court erred by failing to bar the State from eliciting testimony from White's attorney regarding the scope of the attorney's representation of members of the criminal enterprise. Finally, White contends that the trial court abused its discretion by failing to specify adequately its reasons for imposing a sentence in excess of the SENTAC guidelines and by relying upon certain factual predicates which he challenges on various grounds. As explained below, we find no plain error and AFFIRM the judgment below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We provide the following background facts consistent with the jury verdict and based upon the record before us. White was tried with two other defendants, Damon

Anderson and Eric Lloyd.[1]  Of the three, White was the only one charged with Attempted

Murder.  Other than disputing involvement in or connection with any attempted murder,

Dwayne White conceded the truth of most of the State's accusations against him.  He

concedes his involvement in a complex narcotics enterprise.  White was a key figure and

eventually, the leader of it.[2]  From 2015 until 2019, the members of that enterprise sold

large amounts of cocaine and heroin, and conducted sophisticated business operations,

including maintaining multiple limited liability companies ("LLCs"), concealing activity

by assigning property ownership to others, and maintaining detailed financial records.[3]

---

[1] The record is replete with their nicknames:  White (aka, "BD" or "Boop"), Lloyd (aka "Butter," "Butterico" or "Bub"), and Anderson (aka "Frog").

[2] *See* Op. Br. at 4 n.4 ("In a teleconference on May 31, 2019, White's attorney confirmed that his strategy was to concede guilt to the drug dealing, conspiracy to commit drug dealing and racketeering as supported by the predicate acts, but to deny all involvement in the conspiracy to commit murder and related charges.").  White followed through with this strategy at trial.  App. to Op. Br. at A64–66 (White Opening Statement) ("There is a lot of charges here having to do with the drug dealing and they're true.  My client did sell drugs.  There is a lot of evidence that you are going to see here of money at a casino, thousands and thousands of dollars at a casino.  No W–2 to substantiate that.  That's true.  That's money laundering. . .  What my client, Dwayne White, has absolutely nothing to do -- and I'll say this -- absolutely nothing to do with is the shooting of that little boy.  And I mean nothing."); *see also* App to State's Ans. Br. at B76, B78 (White's Opening Statement) ("He did try to bribe the family of that little boy to save the years of the life of Michael Pritchett," and stating:  "Did he launder money?  Yes, he did.  Did he bribe the family? Yes he did."); App. to Op. Br. at A158, 161, 168, 206 (summation), App. to Op. Br. at A223, 231, 238 (White's counsel at sentencing argued that White demonstrated acceptance of responsibility by not contesting the evidence, or the charges, relating to most of the offenses he faced.).

[3] Op. Br. at 4–5; *see also* App. to Ans. Br. at B667–68, B670 (Testimony of Tyrone Roane) (alleging that cocaine with which he was arrested was given to him by White for him to sell); App. to State's Ans. Br. at B1098 (Testimony of Dontae Sykes) ("Limited liability companies, I used to use it for, you know, put your cars in your LLC, that way the police get behind you, your company comes up instead of your name so they can't profile you and pull you over," and "[y]ou can use the LLC, you know, to shift money around that it's not, you know, directly attached to you . . . .").

Certain members of the enterprise, the so-called "Big Screen Boys," feuded with one of their former affiliates, Markevis Stanford.[4] Believing him to be a "rat," the Big Screen Boys produced and disseminated on the internet rap music videos insulting Stanford, and a pornographic tape of some of the members with Stanford's girlfriend, Keyonna Perkins.[5] Their feud escalated to violence, including reprisal robberies, and eventually a shooting in the Riverside housing projects.[6] Certain other members of the enterprise called themselves "The Four Horsemen of Riverside." Those members, Dwayne White, his brother Rasheed White, Teres Tinnin, and Michael Pritchett, were high level drug dealers in the City of Wilmington.[7]

On June 6, 2017, Markevis Stanford was targeted in two shootings, one in Newark and one later in Wilmington.[8] Stanford avoided being hit by the gunfire in both incidents.

---

[4] Op. Br. at 5; *see also* App. to Ans. Br. at B713–14 (Testimony of Tyrone Roane) (describing the feud and exchanges of reprisals between Stanford and other members of the enterprise); *see also* App. to State's Ans. Br. at B1103 (Testimony of Dontae Sykes). The Big Screen Boys included Ryan Bacon, Maurice Cooper, Dante Sykes, Teres Tinnin and Michael Pritchett. Tyrone Roane testified that "[b]ig screening means basically when you got a group of individuals, that take a female, have sex with her and record it and spread it through social media, basically a big screen." App. to State's Ans. Br. at B713. Roane testified that the group also included Dion Oliver (aka "Fine Wine"), and "Buck 50 [Ryan Bacon]." *Id*. He testified that Dion Oliver had been shot as a result of a feud with "Young Money." *Id*. at B712–15. Sykes identified Markevis Stanford as "Young Money." *Id*. at B1088 (Testimony of Dontae Sykes).

[5] Op. Br. at 5; App. to State's Ans. Br. at B713–21 (Testimony of Tyrone Roane).

[6] *Id*.

[7] App. to Ans. Br. at B333 (Testimony of Det. Barnes) (confirming his description of the Four Horsemen as the most high level drug dealers in the City of Wilmington). The indictment and record reflect the following nicknames: Michael Pritchett (aka "M Dot," "Dot" or "Tuckermaxx"); Tinnin (aka "Versace" or "Sacchey"); Rasheed White (aka "Fatty" or "Goat"). App. to Op. Br. at A127.

[8] Op. Br. at 6.

But, in the second shooting, a stray bullet struck six-year-old innocent bystander Jashown Banner in the head causing him to suffer paralysis and brain damage.[9] The shooting left the child confined to a ventilator and able to move only his eyes. Banner was sitting in his mother's car with his younger sister, mother, and grandmother while Stanford hid behind it. In the third incident on that same day, assailants kidnapped and murdered Perkins.[10]

During the State's investigation, it discovered a recorded phone call between Stanford and an imprisoned associate during which Stanford identified Michael Pritchett as a shooter in both June 6 attacks on him. Police arrested Pritchett.[11] In response, White offered Jashown Banner's family members a $20,000 bribe to produce a sworn statement denying Pritchett's involvement and to deliver it to attorney Joseph Benson. At trial, White stipulated to the fact that he attempted to bribe Banner's family.[12]

Investigating with FBI assistance, the State obtained a wiretap on White's cell phone. This wiretap revealed the existence of the enterprise to law enforcement, and produced a significant amount of information about the scope of its operations.[13] It also

---

[9] *Id.*

[10] Op. Br. at 6; *see also* App. to Ans. Br. at B1104 (Cross-Examination of Dontae Sykes) (discussing his involvement with that event). Sykes was facing the possibility of the death penalty when he testified. White was not charged in Perkins's kidnapping or murder.

[11] Op. Br. at 7; *see also* App. to Ans. Br. at B722–25 (Testimony of Tyrone Roane) (discussing the arrest of Michael Pritchett for the Jashown Banner shooting, and his personal knowledge of White's efforts to bribe Banner's family into silence).

[12] B1133 (Testimony of Det. Barnes); *see also* Op. Br. at 7; *see* App. to Op. Br. at A79 (White's Opening Statement) ("He did try to bribe the family of that little boy to save the years of life of Michael Pritchett.").

[13] *Id.*; *see also* App. to Ans. Br. at B1156–59 (Direct Examination of Special Agent Haney) (showing and discussing the content of wiretap recordings and audiovisual surveillance recordings of White and his associates).

recorded White communicating with imprisoned associates, seeking to have Stanford intimidated or killed.[14]

In early September 2017, police executed a search warrant on White's home.[15] They found paraphernalia associated with the drug trade, large amounts of cash, cellular phones, and business records relating to the enterprise's financial dealings and drug transactions, and some of White's personal tax records.[16] Some of these items smelled of or field-tested positive for the presence of cocaine. Police also discovered that White's girlfriend obtained an apartment at the Whitney Apartments in Claymont for White to use. White paid for it with cash and money orders. Police searched this apartment and located cocaine residue, scales, pots, bags and other items used in the drug operation.[17]

Police arrested White on October 25, 2017.[18] On November 13, 2017, a New Castle County grand jury handed down a thirty-six count indictment against White and his

---

[14] Op. Br. at 8.

[15] App. to State's Br. at B1164 (Testimony of Special Agent Shawn Haney).

[16] *Id.*

[17] *Id.* at B393–94 (Testimony of Det. Barnes).

[18] As a result of the wiretap, Nyeesha White, White's wife, was also arrested in October 2017. Her $24,000 bail was paid in money orders of $1000 increments by Lloyd. *See* App to State's Br. at B189–197 (Testimony of Bail Bondsman Lebron Jones).

codefendants.[19]  The indictment spanned a period from January 2015 to January 2019.  The State brought twenty-four counts to trial.[20]

White proceeded to a joint jury trial with co-defendants Eric Lloyd and Damon Anderson beginning on June 3, 2019.  Among the evidence presented, three associates of the enterprise (William Wisher, Tyrone Roane and Dontae Sykes) testified as to their direct involvement with Lloyd and White, among others, and the crimes that were committed.  They cooperated after being charged with criminal offenses.

Roane testified about selling drugs for the enterprise and about his interactions with White in such activity.[21]  Roane testified that members of the enterprise, including White, were sometimes able to access and review discovery in their co-defendants' criminal cases

---

[19] App. to Op. Br. at A21–A43 (Indictment).  The nineteen predicate offenses included in the Racketeering charge included:  Drug Dealing Heroin, Aggravated Possession of Heroin, Drug Dealing Cocaine, Money Laundering, Criminal Solicitation, Conspiracy First Degree, Aggravated Act of Intimidation, Bribing a Witness, Conspiracy Second Degree, Possession of a Firearm by a Person Prohibited or Possession of a Firearm During the Commission of a Felony, Attempt to Evade or Defeat Tax, Tampering with Physical Evidence, Conspiracy First Degree and Attempted Murder First Degree.  App. to Op. Br. at A135 (Jury Instructions).

[20] App. to Op. Br. at A149.  White submitted an unsigned version of the twenty-four count trial indictment with his reply brief.  App. To Reply Br. at AR2–23 (Trial Reindictment).  The charges contained in the grand jury indictment but removed from the trial indictment were the original Counts Twelve (another Conspiracy Second Degree count relating to aggravated possession of heroin with particular co-conspirators on a specific date), Twenty and Twenty-One (additional counts of conspiracy to commit money laundering), Twenty-Six (misdemeanor terroristic threatening), Twenty-Seven (misdemeanor criminal mischief), Count Twenty-Eight (misdemeanor possession of promethazine with codeine), and Counts Thirty-One through Thirty-Six (alleging firearms possession, aggravated menacing, conspiracy to commit aggravated menacing, and several misdemeanors).  App. to Op. Br. at A32, A36, A39, A41–43.

[21] Roane pled guilty to multiple counts of conspiracy.  App. to State's Ans. Br. (Testimony of Tyron Roane) at B726, B689; *see also* B687–88 (discussing the intensification of White's dealing heroin and cocaine).

7

through use of an attorney, Joseph Benson, who represented some of its members.[22] White called Roane's wife suspecting that Roane was cooperating with the police. White obtained a sealed copy of Roane's plea agreement.[23] White discussed the agreement on prison calls with Darryl Kelley and Tawayne Powell, and White said he wanted them to spread the word.[24] After Roane pled guilty, a copy of his plea agreement was posted on social media along with a wedding picture of Roane and his wife.[25] The obvious purpose for publishing the sealed agreement was to intimidate Roane. Roane also testified about the feud with Markevis Stanford and how a bounty on Stanford began and was increased and how the hostility escalated.[26] He discussed White's involvement in trying to bribe Jashown Banner's family in order to help Pritchett. Roane was present when White hosted the party at the 8th & Union restaurant in 2017 as a farewell to Lloyd, who was about to serve a federal prison sentence for violation of probation.[27]

Wisher stated that Lloyd was head of the enterprise and that he was involved in dealing cocaine for Lloyd. Wisher maintained a consignment arrangement with Lloyd whereby Lloyd would provide Wisher with powder cocaine for an agreed price. Wisher would keep as profit amounts he received above the agreed price.[28] Wisher also described

---

[22] App. to State's Ans. Br. at B707–09.

[23] *Id.* at B1169–70 (Testimony of Det. Barnes).

[24] *Id.*

[25] *Id*. at 723–34 (Testimony of Tyrone Roane); *id*. at 1136–37, 1170–71 (Testimony of Det. Barnes).

[26] *Id*. at 718–719.

[27] *Id*. at B688–690.

[28] App. to State's Ans. Br. at B1005–007 (Testimony of William Wisher).

8

the meeting at the 8th & Union restaurant, when the operation was transferred from Lloyd to White. He stated that he then began selling heroin for White.[29]

Sykes testified as a State's witness and discussed the drug operation. According to Sykes, Lloyd was at the top of the cocaine trade in Wilmington and White, backed by Lloyd, was at the top of the heroin trade.[30] When Lloyd went to federal prison in 2017, Sykes began dealing with White directly.[31] Both Lloyd and White, in their cross-examinations of Sykes and Wisher, attempted to discredit their testimony as cooperating witnesses for the State.[32] Although the offenses for which White was convicted included two drug dealing charges, Lloyd was found Not Guilty of Drug Dealing Cocaine, but Guilty of two drug conspiracy charges among other charges.[33]

Sykes also explained their use of LLCs to hide physical assets and money.[34] He testified about the investment properties obtained to launder money and about the transfer

---

[29] Wisher, a habitual offender, pled guilty to Conspiracy to Commit Racketeering, Drug Dealing Cocaine, Conspiracy Second Degree, Drug Dealing Heroin, and Possession of a Firearm by a Person Prohibited. App. to State's Ans. Br. at B991, B997, B1033–36 (Testimony of William Wisher). He was sentenced to twenty-one years of incarceration. *Id*. at B998, B1069.

[30] *Id*. at B1091; *see also* B1002 (Sykes testified that Lloyd ran the show: "the whole giddy up. He passed the torch to Mr. White.").

[31] *Id*. at B1092.

[32] We recognize that Lloyd's conviction and sentence are subject to a separate appeal, that he disputes the testimony of Sykes and Wisher, and that he argues that the jury's acquittal of his Drug Dealing Cocaine charge shows that the jury did not find Wisher and Sykes to be credible. In Lloyd's appeal, the State counters that Lloyd did run a cocaine distribution enterprise. We will address Lloyd's issues in his separate appeal and not herein.

[33] Lloyd was found guilty of Racketeering (Count I), Conspiracy to Commit Racketeering (Count 2), two counts of Conspiracy Second (Counts 16 and 18), Money Laundering (Count 17) and Attempt to Evade or Defeat Tax (Count 23). App. to Op. Br. at A153–55 (Jury Verdict).

[34] *Id*. at B1098.

of leadership at the 8th & Union restaurant. He was familiar with the feud with Markevis Stanford. He testified in detail about the bounty and White's involvement in increasing the bounty on Stanford's life.[35] He was aware of White's plan to bribe the family of Jashown Banner.

Detective Barnes and Special Agent Haney provided details of the money laundering operation. This included gambling at casinos, sports betting, use of money orders, purchase of high-end items, and the purchase of real estate. The State presented evidence of White's gambling activity totaling $1.3 million from 2015 to 2017. No taxes were paid on any of the revenue generated by the criminal activity detailed by the State.[36]

The State presented testimony from Michelle Hoffman, a forensic accountant. She focused mainly on the activities of White and Lloyd involving amounts in excess of $750,000.00. She also described facts surrounding certain of the limited liability companies connected to Lloyd, White's wife, and White, among others. She described a property in Elkton, Maryland that was owned by Nyeesha White as Trustee for a family trust.[37] The property was transferred to NCTZA LLC. The address for this entity was an

---

[35] App. to State's Ans. Br. at B1094–95 (Testimony of Dontae Sykes); *see also* B718 (Testimony of Tyrone Roane).

[36] The State introduced evidence that Dwayne and Nyeesha White's 2016 income tax return reflected total adjusted gross income of $43,000. App. to State's Ans. Br. at B418–19 (Testimony of Det. Barnes).

[37] App. to State's Ans. Br. at B1233.

address Lloyd listed as his primary residence.[38]  A document from the Delaware Division of Corporations listed the registered agent for NCTZA LLC as Joseph W. Benson, P.A.[39]

Another property was purchased at a sheriff's sale by One-Pie Investments LLC. That entity assigned its bid to Eric Lloyd, who then assigned it to T&B DE Homes, LLC.[40] Tinnin, one of the "Four Horsemen," was listed as the Managing Member of T&B DE Homes LLC.  This property was then transferred to Nyeesha White as Trustee for another family trust.  A page of the deed was signed by Dwayne White, as representative of T&B DE Homes LLC.[41]  Detective Barnes testified that with respect to another entity, GNB Homes, the "G" stood for "Goat" and the "B" stood for "Boop" or as he said, "Teres and Boop" -- meaning Tinnin and White.[42]

On June 14, 2019, after a nine-day trial, a jury convicted White of all charges, except the attempted murder charge relating to the June 6 shooting and two counts of Conspiracy Second Degree.[43]  In the specific findings of fact, the jury found the Racketeering charge supported by every alleged predicate offense except for attempted murder.[44]

In total, the jury convicted White of the following offenses:

---

[38] *Id.* at B1234.

[39] *Id.* at B1234–1237.

[40] *Id.* at B1237.  Another entity, NCTZAL, LLC also listed Benson as its registered agent.

[41] *Id.* at B1236.

[42] *Id.* at 1239.

[43] App. to Reply Br. at AR21–34 (Verdict Sheet) (White was found Not Guilty of Count 3 (Attempted Murder First Degree), Count 8 (Conspiracy Second Degree) and Count 9 (Conspiracy Second Degree)).

[44] *Id.* at AR21–26.

(1)     Criminal Racketeering (along with specific findings of eighteen predicate offenses);[45]

(2)     Conspiracy to Commit Racketeering;

(3)     Two counts of Conspiracy First Degree;

(4)     Drug Dealing Heroin (Tier IV);

(5)     Aggravated Possession of Heroin (Tier V or higher);

(6)     Conspiracy Second Degree (eight counts);[46]

(7)     Drug Dealing Cocaine (Tier IV);

(8)     Money Laundering;

(9)     Criminal Solicitation;

(10)    Aggravated Act of Intimidation;

(11)    Bribing a Witness;

(12)    Attempt to Evade or Defeat Tax; and

(13)    Tampering with Physical Evidence.[47]

The trial court noted that several of the charges merged, with aggravated possession of heroin merging into the corresponding drug dealing charge, and conspiracy to commit racketeering merging into the racketeering charge.[48] The trial court likewise imposed only

---

[45] The eighteen predicate offenses for which he was found guilty included:  Drug Dealing Heroin, Aggravated Possession of Heroin (Tier 5 or higher), Drug Dealing Cocaine, Money Laundering, Criminal Solicitation, Conspiracy First Degree, Aggravated Act of Intimidation, Bribing a Witness, Conspiracy Second Degree, Possession of a Firearm by a Person Prohibited or Possession of a Firearm During the Commission of a Felony, Attempt to Evade or Defeat Tax, Tampering with Physical Evidence, and Conspiracy First Degree.  App. to Op. Br. at A153–54 (Jury verdict).

[46] The Conspiracy Second Degree charges all relate to the narcotics offenses in the indictment, with the exception of a single count of conspiracy to commit money laundering.  *See* Appellant's App. to Reply Br. at AR16.

[47] App. to Ans. Br. at B1333–1337 (Jury Instructions).

[48] App. to Op. Br. at A254 (Sentencing Hearing).  The State recommended merging Conspiracy to Commit Racketeering into Racketeering post-conviction.  App. to Op. Br. at A181 (State's Sentencing Memorandum).  The trial court acceded to this recommendation.  *Id*. at A254 (Sentencing Hearing).  However, this Court has previously held that the two offenses do not merge.

a single sentence for all the Conspiracy Second Degree counts.[49]  White did not request

that the trial court merge any of the other counts at that or any other time.[50]

The State recommended a seventy-year sentence, which was substantially longer

than SENTAC guidelines.[51]  After a presentence investigation and a sentencing hearing,

on October 18, 2019, the Court imposed a shorter total sentence, but still one above

SENTAC guidelines, including a lengthy period of incarceration at Level V, followed by

declining levels of supervision, as well as fines, and surrender of White's interest in the

enterprise's LLCs.[52]  In reaching this sentence, the Superior Court imposed a period of

Level V incarceration including: separate consecutive sentences of five years each at Level

V for the two counts of Conspiracy First Degree, twenty years (Level V) for Racketeering,

ten years (Level V) for Drug Dealing Heroin (Tier IV), five years (Level V) for Drug

Dealing Cocaine, two years (Level V) for Attempting to Evade or Defeat Tax, two years

(Level V) for Attempting to Bribe a Witness, and five years (Level V) for Aggravated Act

of Intimidation (to run concurrently with one of the Conspiracy First convictions), and two

years (Level V) suspended for one year (Level III) for all the Conspiracy Second Degree

---

*See Stroik v. State*, 671 A.2d 1335, 1343 (Del. 1996) (holding that "[v]iolation of 11 *Del. C.* § 1503(a) does not require an agreement and can be achieved through the acts of one person," and that "[i]t is clear that 11 *Del. C.* § 1503(d), proscribing conspiracy to commit racketeering, contemplates a wholly separate offense that should not merge with offenses under § 1503(a)."). Even so, the trial court would have had the authority to impose concurrent sentences since neither Racketeering nor Conspiracy to Commit Racketeering is among the enumerated offenses requiring consecutive sentencing.  11 *Del. C.* § 3901(d).

[49] *Id*. at A256.

[50] *Id*. at A254–258.

[51] "SENTAC" refers to the Delaware Sentencing Accountability Commission Benchbook.

[52] Appellant's App. to Op. Br. at 254–256 (Sentencing Hearing).

counts.[53]  Several of these terms are above-guideline sentences, and the trial court invoked

the court's authority[54] to disallow 'good time' reductions on several of them.[55]

## II. ANALYSIS

White concedes that all issues related to his convictions are being raised for the first

time on appeal and so are subject to our plain error review.  "The doctrine of plain error is

limited to material defects which are apparent on the face of the record; which are basic,

serious, and fundamental in their character; and which clearly deprive an accused of a

substantial right, or which clearly show manifest injustice."[56]

### A. White's Multiplicity Contentions

Both the United States and Delaware Constitutions guarantee that no person shall

be "twice put in jeopardy of life or limb."[57]  Among the rights afforded by the Double

Jeopardy Clauses is "protect[ion] against multiple punishments for the same offense."[58]

This protection is termed *multiplicity* and flows from the principle that "[l]egislatures, not

courts, prescribe the scope of punishments."[59]  "The multiplicity doctrine, which is rooted

---

[53] App. to Op. Br. at A255–56 (Sentencing Hearing).

[54] 11 *Del. C.* § 4204(k)(1).

[55] App. to Op. Br. at A254–55 (Sentencing Hearing).

[56] *Morales v. State*, 133 A.3d 527, 529 (Del. 2016) (quoting *Baker v. State*, 906 A.2d 139, 150 (Del. 2006)).

[57] *See* U.S. Const. amend. 5 ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); Del. Const. art. I, § 8 ("no person shall be for the same offense twice put in jeopardy of life or limb").  We have previously described the language of these clauses as "virtually identical." *Tarr v. State*, 486 A.2d 672, 673 n.1 (Del 1984).

[58] *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

[59] *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983).

in the prohibition against double jeopardy, prohibits the State from dividing one crime into multiple counts by splitting it 'into a series of temporal or spatial units.'"[60]

White raises two different multiplicity arguments related to his conspiracy and racketeering convictions. *First*, he argues that his convictions for Conspiracy in the First Degree are lesser included offenses of his Racketeering conviction. *Second*, he argues that his Conspiracy Second Degree and Conspiracy First Degree convictions all merge into one count because they concern an ongoing conspiratorial relationship which he claims is "subsumed under the continuing conspiracy envisioned by the conspiracy to commit racketeering charge."[61]

Where a criminal defendant presents a multiplicity argument not raised below, this Court reviews it for plain error.[62] "A multiplicity violation may constitute plain error."[63] Plain error review in a multiplicity challenge not contesting the facts is effectively *de novo*.[64]

---

[60] *Mills v. State*, 201 A.3d 1163, 1169 (Del. 2019) (quoting *Spencer v. State*, 868 A.2d 821, 823–24 (Del. 2005) and *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977)).

[61] Op. Br. at 23.

[62] *Zugehoer v. State*, 980 A.2d 1007, 1013 (Del. 2009).

[63] *Handy v. State*, 803 A.2d 937, 940 (Del. 2002) (citing *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002).

[64] *See, e.g. Mills*, 201 A.3d at 1169 ("Because this is a pure statutory interpretation issue, the standard of review is effectively *de novo*.") (citing *Patrick v. State*, 922 A.2d 415, 2007 WL 773387, at *2 (Del. 2007) (TABLE)). *Mills*, like *Handy* and *Zugehoer*, includes the verbatim recitation that "a multiplicity violation may constitute plain error." *Id*. at 1168.

15

### 1. *White's Conspiracy First Degree and Racketeering Convictions Do Not Violate Double Jeopardy*

As to White's first contention, the Double Jeopardy Clauses protect against "(1) successive prosecutions; (2) multiple charges under separate statutes; and (3) being charged multiple times under the same statute."[65] Where the charges derive from two different statutes "the question is whether, both sections being violated by the same act, the accused committed two offenses or only one" for which the inquiry is "whether each provision requires proof of a fact which the other does not."[66] This is a principle of statutory construction that derives from the underlying assumption that the legislature does not intend to punish the same offense under two different statutes.[67] However, that rule of construction "gives way in the face of clear legislative intent to the contrary."[68] This test is codified in Delaware statute at 11 *Del. C.* § 206,[69] and is satisfied where an inquiry into

---

[65] *Nance v. State*, 903 A.2d 283, 286 (Del. 2006).

[66] *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

[67] In considering double jeopardy claims based on multiple punishments, we have observed that "whether a defendant can be punished multiple times is a question of statutory construction, and we must ask whether 'the General Assembly intend[ed] to impose more than one punishment for a single occurrence of criminal conduct.'" *Mills*, 201 A.3d at 1169 (quoting *Poteat v. State*, 840 A.2d 599, 603–04 (Del 2003)).

[68] *LeCompte v. State*, 516 A.2d 898, 900 (Del. 1986) (citing *Whalen v. United States*, 445 U.S. 684, 92, 100 S.Ct. 1432, 38, 63 L.Ed.2d 715 (1980)). As the Third Circuit has observed, by contrast, "cumulative punishment is *presumptively* valid if the statutes define distinct offenses." *United States v. Pungitore*, 910 F.2d 1084, 1116 (3d Cir. 1990) (citing *Garrett v. United States*, 471 U.S. 773, 793 105 S.Ct. 2407, 55 L.Ed.2d 764 (1985)). "[T]he presumption when Congress creates two distinct offenses is that it intends to permit cumulative sentences, and legislative silence on this specific issue does not establish an ambiguity or rebut this presumption." *Id.* (quoting *Garrett*, 471 U.S. at 793).

[69] 11 *Del. C.* § 206; *see also Mills v. State*, 201 A.3d at 1167 (stating that "11 *Del. C.* § 206 . . . is essentially Delaware's codification of the test laid out by the United States Supreme Court in *Blockburger v. United States* to determine whether two offenses are the same for double jeopardy

the statutes demonstrates "each requires proof of at least one element that is not required to prove the others."[70]

Conspiracy is divided into three categories based on the severity of the offense contemplated.[71] Conspiracy Second Degree is defined as follows:

> A person is guilty of conspiracy in the second degree when, intending to promote or facilitate the commission of a felony, the person:
>
> > (1) Agrees with another person or persons that they or 1 or more of them will engage in conduct constituting the felony or an attempt or solicitation to commit the felony; or
> >
> > (2) Agrees to aid another person or persons in the planning or commission of the felony or an attempt or solicitation to commit the felony; and the person or another person with whom the person conspired commits an overt act in pursuance of the conspiracy.[72]

Conspiracy First Degree is identical, except that the contemplated felony must be a class A felony.[73] These three clauses articulate three elements -- intent, agreement (obtainable in two ways), and an overt act.[74]

---

purposes"); *Jones v. State*, 227 A.3d 1097, 2020 WL 1845887, at *7 (Del. Apr. 13, 2020) (TABLE) ("The *Blockburger* test was codified in 11 *Del. C.* § 206.").

[70] *Williamson v. State*, 707 A.2d 350, 362–63 (Del. 1998).

[71] 11 *Del. C.* §§ 511–13.

[72] 11 *Del. C.* §§ 512.

[73] 11 *Del. C.* §§ 513.

[74] *See Dougherty v. State*, 21 A.3d 1, 1 (Del. 2011) ("a person is guilty of conspiracy second degree when, intending to promote the commission of a felony, 'the person ... [a]grees to aid another person ... in the planning or commission of the felony ... and the person or another person with whom the person conspired commits an overt act in pursuance of the conspiracy.'") (quoting 11 *Del. C.* § 512) (ellipses in original).

A conviction for racketeering requires proof of three elements, namely: (1) that the defendant was associated with an enterprise; (2) that the defendant conducted the enterprise through a pattern of racketeering activity or defendant participated in the enterprise's affairs through a pattern of racketeering activity; and (3) that the defendant's conduct or participation in the pattern of racketeering was intentional.[75] An "enterprise" shall include "any individual, sole proprietorship, partnership, corporation, trust or other legal entity,

---

[75] *Lloyd v. State*, 152 A.3d 1266, 1270 (Del. 2016). In *Lloyd*, this Court recommended that the Superior Court model its jury instructions on criminal racketeering after the Third Circuit's model instructions. The Third Circuit's instructions list the elements as follows:

6.18.1962C RICO – Conducting or Participating in the Conduct of the Affairs of an Enterprise Through a Pattern of Racketeering Activity; Elements of the Offense (18 U.S.C. § 1962(c))

Count *(no.)* of the indictment charges defendant *(name)* with violating the Racketeer Influenced and Corrupt Organizations Act, also known as RICO. Under this statute, it is a federal crime for any person who is employed by or associated with an enterprise that is engaged in or affects interstate or foreign commerce, to conduct or to participate in the conduct of the affairs of that enterprise through a pattern of racketeering activity.

In order to find *(name)* guilty of this offense, you must find that the government proved each of the following five elements beyond a reasonable doubt:

First: The existence of an enterprise;

Second: That the enterprise was engaged in or its activities affected interstate or foreign commerce;

Third: That *(name)* was employed by or associated with that enterprise;

Fourth: That *(name)* knowingly participated, directly or indirectly, in the conduct of that enterprise's affairs; and

Fifth: That (name) knowingly (conducted) (participated, directly or indirectly, in the conduct of) that enterprise's affairs through (a pattern of racketeering activity) (the collection of an unlawful debt), as alleged in the indictment.

I will now explain the law that applies to these elements.

THIRD CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS, *Racketeer Influence and Corrupt Organizations (RICO)*, No. 6.18.1962C RICO – Conducting or Participating in the Conduct of the Affairs of an Enterprise Through a Pattern of Racketeering Activity; Elements of the Offense, available at https://www.ca3.uscourts.gov/sites/ca3/files/Chap%206%20RICO% 2012%202018%20rev%20draft.pdf (last visited Dec. 5, 2020). That listing of elements from the Third Circuit's current instructions is identical to the one we favorably referenced in *Lloyd*.

18

and any union, association or group of persons associated in fact, although not a legal entity."[76]  An enterprise may include illicit as well as licit enterprises.[77]  A "pattern of racketeering activity" is two or more incidents of conduct within ten years of one another that (1) constitute racketeering activity, (2) are related to the affairs of the enterprise, and (3) are not so closely related to each other and connected in point of time and place that they constitute a single event.[78]  "Racketeering activity" includes any Delaware felony, or a misdemeanor from an enumerated list.[79]

Conspiracy First Degree contains an element absent from racketeering, namely, an intent and agreement relating to a class A felony.  Racketeering likewise contains unique elements:  association with an enterprise, and a pattern of multiple predicate racketeering activity offenses within ten years of each other in service of the enterprise.  The *Blockburger* rule is a rule of statutory construction.[80]  The inquiry is whether the statutory elements of one offense necessarily satisfy the other, not whether, in a specific case, a single act completed both offenses.[81]  The offenses of Racketeering and for Conspiracy

---

[76] 11 *Del. C.* § 1502(3).

[77] *Id.*

[78] 11 *Del. C.* § 1502(5).

[79] 11 *Del. C.* § 1502(9).

[80] *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981).

[81] *See Blockburger*, 284 U.S. at 304 ("'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, and acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'"); *United States v. Faulhaber*, 929 F.2d 16, 19 (1st Cir. 1991)  (securities and mail fraud charges were not void as multiplicitous because the securities fraud statute required fraud in connection with the purchase or sale of securities, while the mail fraud statute did not have

First Degree each require proof of facts not *necessary* to complete the other and so can support separate convictions and punishments without offending the Double Jeopardy Clauses.[82]

In his brief, White emphasizes that "racketeering," as defined in the statute, includes "conspiring to engage in . . . [a]ny activity constituting any felony which is chargeable under the Delaware Code."[83] But a "Class A felony" is a narrower category than "any felony." The facts a jury was *required* to find in order to find a conspiracy predicate to racketeering are insufficient to prove a Conspiracy First Degree. To satisfy the elements of Conspiracy First Degree, the jury must find, in addition, that the conspiracy contemplated a Class A felony. Class A felonies include crimes for which our General Assembly has reserved the most serious of punishments, *e.g.*, 11 *Del. C.* § 636 (Murder in the First Degree); 11 *Del. C.* § 773 (Rape in the First Degree); 11 *Del. C.* § 787(5) (trafficking in persons for use of body parts); 16 *Del. C.* § 1136(a)(3) (abuse, mistreatment, or neglect of a resident of a long-term care facility resulting in death); 31 *Del. C.* § 3913(c) abuse, mistreatment, or neglect of an impaired adult resulting in death).

White's interpretation, if adopted, would effectively immunize racketeers from additional liability should they conspire with their confederates to escalate their criminal endeavors -- in for a penny, in for a pound. Such a conclusion is at odds with the General

---

that requirement, and the mail fraud offense required either use of mail or use of any facility of interstate commerce).

[82] White raises issues surrounding Conspiracy to Commit Racketeering more forcefully in his second assignment of error, so we discuss it in greater depth in the next section *infra*.

[83] Op. Br. at 18 (quoting 11 *Del. C.* § 1502(9) (definition of "Racketeering").

Assembly's announced intent in enacting the RICO statute to "guard against and prevent the infiltration of racketeering into legitimate businesses," and to reach "conduct beyond what is traditionally regarded as 'organized crime' or 'racketeering.'"[84]  Further, many federal courts, construing legislative intent and applying *Blockburger*, have held that imposing separate consecutive sentences for RICO violations and accompanying predicate offenses does not violate Double Jeopardy.[85]  Although federal law is not controlling here, we have described Delaware's RICO statute as "essentially an adaptation" of the federal one, and have found federal precedent to be helpful guidance.[86]

### 2. *Conspiracy To Commit Racketeering Does Not Merge With The Other Conspiracy Charges.*

Criminal Conspiracy is one of a series of inchoate crimes defined Title 11, Chapter 5, Subchapter I of the Delaware Code.  "If a person conspires to commit a number of crimes, the person is guilty of only 1 conspiracy, so long as the multiple crimes are the object of the same agreement of continuous conspiratorial relationship."[87]  White argues that, because all of the substantive offenses which were the objects of his various Conspiracy counts were themselves predicate offenses establishing the pattern of

---

[84] *See* 11 *Del. C.* § 1501 (setting forth the statute's Statement of Purpose).

[85] *See e.g.,United States v. Pungitore*, 910 F.2d 1084, 1108 n.24 (3d Cir. 1990); *United States v. Crosby*, 20 F.3d 480, 484 (D.C. Cir. 1994) ("we hold, as have other circuits, that Congress intended that a RICO violation be a discrete offense that can be prosecuted separately from its underlying predicate offenses.") (citing cases); *see also infra*  nn. 105–107.

[86] *See Stroik*, 671 A.2d at 1340 (stating that, "[s]ince the Delaware RICO statute is essentially an adaptation of its federal counterpart, reliance on federal precedent in this limited factual setting is warranted.").  As we observed in note 76 *supra*, we have even gone so far as to instruct the Superior Court to model its RICO jury instructions on the Third Circuit's.  *Lloyd*, 152 A.3d at 1273.

[87] 11 *Del. C.* § 521(a).

racketeering activity, they are all objects of the same continuous conspiratorial relationship with his Conspiracy to Commit Racketeering and so merge into it.

White argues, correctly, that the continuous conspiratorial relationship doctrine prohibits the State from "piling on" conspiracy charges by subdividing a single ongoing criminal conspiracy.[88] When defendants enter into a single agreement to commit multiple crimes, they are guilty of only one Conspiracy count.[89] But that is no defense when the confederates merely maintain a generalized criminal relationship, agreeing to new offenses as the circumstances arise -- in those cases, each time they intentionally enter into a new agreement consummated by an overt act they have fulfilled the three elements of a new count of conspiracy and are subject to a separate conviction.[90] When conspirators reach a new agreement to commit a new crime, accompanied by a new intent, they have committed a new offense.

---

[88] *See Alston v. State*, 554 A.2d 304, 312 (Del. 1989) ("Under section 521(a), if an individual conspires to commit several crimes, he is nonetheless guilty of only one conspiracy as long as the multiple crimes are the object of the same agreement.") (citing *Braverman v. United States*, 317 U.S. 49, 53–54, 63 S.Ct. 99, 101–102, 87 L.Ed. 23 (1942)).

[89] *Id.*

[90] *See Corbin v. State*, 608 A.2d 726, 1991 WL 316965, at *5 (Del. Dec. 10, 1991) (TABLE):

> "While the evidence shows that each of the bank robberies, except the sixth robbery, were committed by [the codefendants] in essentially the same manner, there is no evidence which shows that there was a single agreement to commit a continuous series of robberies over a period of time. In fact, [the other defendant] testified that there was not a single overreaching agreement. Instead, the record shows that [the codefendants] developed a separate agreement or plan for each robbery on the spur of the moment as they ran out of money. Therefore, we find that there was sufficient evidence for any rational jury to conclude beyond a reasonable doubt that there were six separate conspiracies to commit the bank robberies, and we affirm [the defendant-appellant's] convictions on each of the six counts of conspiracy in the second degree."

The cases in which this Court has found that conspiracies merge have all involved a single agreement in contemplation of a single criminal transaction,[91] or a single agreement to commit a spree of related crimes all contemplated at the time of the agreement.[92] This accords with the precept in multiplicity that where a single violation merely continues, it remains a single count; but where a violation is committed "*uno ictu,*" meaning 'with one blow,' each violation is a separate offense.[93]

Here, the two convictions for Conspiracy First Degree relate to two separate agreements, two months apart, plotting the murder of Markevis Stanford. Where the June, 2017 plot addressed by Count 4 related to White's alleged agreement with Dion Oliver, Michael Pritchett and others to murder Stanford,[94] the August, 2017 plot related to a later agreement reached with Ira Brown[95] to kill Stanford while both were incarcerated in the James T. Vaughn Correctional Center.[96] The second plot was necessarily not contemplated until the first had failed. Precisely because Brown was incarcerated, White could not have contemplated promoting or facilitating Stanford's murder at Brown's hands until after both

---

[91] *See Liu v. State*, 628 A.2d 1376, 1387–88 (Del. 1993) (where a person conspires to set a single fire resulting in multiple deaths, the multiple murder and arson charges support only a single conspiracy count).

[92] *See Alston*, 554 A.2d at 312 ("the evidence shows only one agreement, *viz.*, to rob whoever left the hotel that night. We agree that the multiple robbery offenses were the object of one agreement and thus may support only one conspiracy conviction.").

[93] *Blockburger*, 284 U.S. at 302 (quoting *In re Snow*, 120 U.S. 274, 286, 7 S.Ct. 556, 562, 30 L.Ed 658 (1887)).

[94] App. to Ans. Br. at B1261 (State's Closing Argument); App. to Op. Br. at A26 (Indictment).

[95] App. to Op. Br. at A37 (Indictment).

[96] App. to Ans. Br. at B1270 (State's Closing Argument); App. to Op. Br. at A37 (Indictment).

the failure of the first plot and Stanford's incarceration at the same institution. Two separate criminal conspiracies involving different people whose objects relate to two separate attempts on the life of a single person support two separate criminal charges.

Likewise, White's indictments for Conspiracy Second Degree reflect conspiracies reached with different individuals to commit different crimes on different dates than the agreements referenced in his Conspiracy First Degree convictions.[97] The intent, agreement, and overt acts to bribe the family of Jashown Banner could only have occurred after Banner was shot on June 6, 2017; but, the intent, agreement, and overt acts relating to the attempt to murder Stanford necessarily occurred before that same shooting. These events relate to different conspiracies. Because the State charged, and the jury found, separate conspiracies with different agreements reached at different times with different

---

[97] We observe that where a defendant is charged with successive violations of the same conspiracy statute, and where a defendant has alleged that the State has impermissibly split a single conspiracy into multiple conspiracies, various courts have considered a number of factors, including: (1) whether there was a common goal among the conspirators, (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators, (3) the extent to which the participants overlap in the various dealings, (4) the location of the two alleged conspiracy and whether it is the same, (5) whether there is a significant degree of temporal overlap between the conspiracies charged, (6) whether there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted co-conspirators), (7) the overt acts charged, and (8) the role played by the defendant. *See United States v. Rigas*, 605 F.3d 194, 213 (3d Cir. 2010); *see also United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (quoting *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989); *United States v. Pierre*, 795 F.3d 847, 849–50 (8th Cir. 2015); *United States v. Wheeler*, 535 F.3d 446, 449 (6th Cir. 2008). This list, intended only as helpful guidance, is not exhaustive and certain factors may be more relevant than others and merit greater weight given the circumstances.

24

people to accomplish separate criminal objects, the trial court properly imposed three separate sentences.[98]

Nor does Conspiracy to Commit Racketeering merge with the Conspiracy First Degree or Conspiracy Second Degree counts. Conspiracy to Commit Racketeering is an offense created by the RICO statute itself, rather than the inchoate crimes chapter.[99] The statute simply instructs that, "[i]t is unlawful for any person to conspire or attempt to violate any of the provisions" of the substantive criminal racketeering statute.[100] Conspiracy to Commit Racketeering requires proof of (1) the existence of an enterprise; (2) that the defendant was associated with the enterprise; and (3) that the defendant agreed to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.[101] The statute also contains no requirement of an overt act, and the federal RICO statute on which it is based[102] "broadened conspiracy coverage by omitting" that requirement.[103]

---

[98] As noted above, the Superior Court imposed a single sentence -- two years at Level V suspended immediately for one year at Level III -- for all eight Conspiracy Second Degree counts, and a separate sentence for each of the two Conspiracy First Degree convictions.

[99] 11 *Del. C.* § 1503(d).

[100] *Id.*

[101] *Stroik*, 671 A.2d at 1342 (citing *Joseph*, 835 F.2d at 1151).

[102] *See id.* at 1340 ("the Delaware RICO statute is essentially an adaptation of its federal counterpart.").

[103] *Salinas v. United States*, 522 U.S. 52, 64, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997); *see also United States v. Williams*, 974 F.3d 320, 368 (3d Cir. 2020) (no overt act element under the federal RICO conspiracy statute).

Moreover, although not binding here, the United States Court of Appeals for the Third Circuit has concluded that "Congress intended separate prosecutions and cumulative punishments for predicate offenses and substantive RICO."[104] In addition, it observed that several other Courts of Appeal have adopted the interpretation that "Congress intended separate convictions or consecutive sentences for a RICO offense and the underlying predicate offense."[105] The Third Circuit has found that the legislative intent to permit cumulative punishment for RICO and for underlying predicate acts also extends to approval of consecutive sentences for Conspiracy to Commit Racketeering and predicate conspiracies.[106] These cases are helpful guidance.

---

[104] *United States v. Grayson*, 795 F.2d 278, 283 (3d Cir. 1986); *see also United States v. Garcia*, 754 F.3d 460, 474 (7th Cir. 2014) (stating that, "[t]he only question before us in thus 'whether Congress, in making the predicate RICO acts relevant to sentence determinations via the Sentencing Guidelines, intended to allow defendants to receive consecutive sentences for both the predicate acts and the RICO offenses,'" and answering that, "[w]e held in [*United States v. Morgano*, 39 F.3d 1358, 1366 (7th Cir. 1994)] that Congress intended exactly this, and every other circuit to consider the questions has agreed with this view.").

[105] *See Grayson*, 795 F.2d at 283 (citing *United States v. Hawkins*, 658 F.2d 279 (5th Cir. Unit A. 1981); *United States v. Corrando*, 304 F.3d 593, 609 n.8 (6th Cir. 2002) ("we have long maintained that the imposition of consecutive sentences for violation of RICO and accompanying predicate offenses does not violate the Double Jeopardy Clause.") (citing *United States v. Sutton*, 700 F.2d 1078, 1081 (6th Cir. 1983); *United States v. Polanco*, 145 F.3d 536, 542 (2d Cir. 1998) ("It is well settled that Congress sought to permit cumulative sentences for a RICO convictions and the predicate offenses upon which the RICO violation is premised."); *United States v. Boylan*, 620 F.2d 359 (2d Cir. 1980); *United States v. Aleman*, 609 F.2d 298, 306 (7th Cir. 1979); and *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979)).

[106] *United States v. Pungitore*, 910 F.2d 1084, 1108 n.24 (3d Cir. 1990) (noting that "other courts have approved consecutive sentences for RICO conspiracies and predicate conspiracies for reasons similar to those asserted in *Grayson*.") (citing *United States v. Kragness*, 830 F.2d 842, 863–64 (8th Cir. 1987); *United States v. Mitchell*, 777 F.2d 248, 264 (5th Cir. 1985)). As the Third Circuit explained in *Pungitore*, "[i]t is important to bear in mind that the RICO conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives." 910 F.2d at 1135. The objective of a RICO conspiracy is to "'assist the enterprise's involvement in corrupt endeavors,'" whereas "the objective of the predicate conspiracy is confined to the commission of a particular substantive offense. . . ." *Id.*

The question in multiplicity inquiries is "whether the General Assembly intended to impose more than one punishment for a single occurrence of criminal conduct."[107] That test is satisfied when each offense "*requires* proof of a fact which the other does not."[108] Conspiracy to Commit Racketeering is an agreement to participate in the conduct of affairs of an enterprise through a pattern of racketeering activity. Conspiracy First Degree is an agreement by a person, acting intentionally, to aid another person in the planning or commission of a class A felony where either the defendant or the other person commits an overt act in pursuit of the conspiracy. Conspiracy Second Degree is a similar agreement, but in contemplation of a lesser felony. The inchoate Conspiracy statutes contain elements absent from Conspiracy to Commit Racketeering and vice versa. They are not multiplicitous.

In explaining our conclusions that no Double Jeopardy violations are established here, we are not suggesting that the distinct nature of the offenses should prompt prosecutors reflexively to seek separate convictions in every case, or for trial judges to necessarily impose separate, consecutive sentences in each such instance. Such decisions fall within the exercise of reasoned discretion and should be based upon the facts and circumstances of each case. As discussed further below in the section of this opinion on White's sentencing challenges, the Superior Court's exercise of discretion in imposing the harsh sentence here is justified by the record.

---

[107] *Mills*, 201 A.3d at 1169.

[108] *Id*. at 1175 (citing *Blockburger*, 284 U.S. at 304) (emphasis added).

27

## B. The Accomplice Liability Instructions

White contends that the placement of the accomplice liability instructions in the charge to the jury, and the absence of instructions advising which charges were subject to accomplice liability, could have led to jury confusion and constitute plain error. The jury was instructed on the elements of the multiple felony conspiracy offenses pending against each defendant. The jury was later instructed on accomplice liability toward the end of the instructions separate from the instructions for each offense. As White contends, "[t]he general rule is that all elements of a crime be listed in a single instruction which provides a complete statement of the elements of the crime charged."[109] White argues that the accomplice liability instruction did not specify which substantive offense it applied to, and, therefore was likely interpreted by the jury to apply to all offenses, including the conspiracy offenses. He then argues that accomplice liability is inapplicable to a conspiracy offense, and that this placement constitutes plain error because it "likely misled the jury into thinking that they could convict [White] of conspiracy as an accomplice to the conspiracy."[110]

White does not challenge the substance of any of the instructions, only the order in which the instructions were given. He did not cite in his briefing any authority for his "general rule" about the order of instructions, but instead focuses on the distinction

---

[109] Op. Br. at 26.

[110] Op. Br. at 29–30.

28

between accomplice liability and the independent crime of conspiracy.[111] At oral argument, White relied on *Probst v. State*, a case where we found plain error based in part upon the order of the instructions and on the likely jury confusion due to the instructions' use of masculine-gendered pronouns.[112] In that case, Probst was indicted on the theory that she alone shot the victim. The State introduced a new theory of liability in its closing argument, namely, that Probst's brother, Miller, actually shot the victim at Probst's urging. Thus, two theories were presented to the jury: (i) that Probst shot the victim, or (ii) that Miller shot the victim and Probst was the accomplice. When the trial court instructed the jury on Probst's potential liability for Miller's conduct, it incorrectly used masculine gender pronouns to describe the female Probst. Following that instruction, the trial judge instructed the jury on defenses applicable to Miller. The court then returned to the felony weapons charge against Probst using masculine pronouns to describe Probst.

We held that "the incorrect use of masculine gender pronouns in an accomplice liability instruction, where the alleged principal is male and the alleged accomplice is a female, made it likely that the jury would be confused."[113] We also found it likely that confusion might occur with regard to the felony weapons charge by its placement following the instructions about Miller's possible justification for shooting. We said that, "as a result

---

[111] White correctly cites to *Manlove v. State*, 901 A.2d 1284, 1288 (Del. 2006) for our explanation of the distinction:

"A conspiracy requires an agreement between co-conspirators, but the object of the conspiracy need not be accomplished. For accomplice liability, generally no prior agreement is required, but the underlying crime must have occurred."

[112] 547 A.2d 114 (Del. 1988).

[113] *Id*. at 120.

of this placement, the jury may have been left with the impression that Probst was also charged with the weapons offense as an accomplice when, in fact, she was only charged with this offense as a principal."[114]  Based upon the combination of these two grounds, we reversed Probst's convictions.

White did not object to the order in which the instructions were given at the time, and so he concedes he must show plain error.  Thus, he must show not merely that the ordering of the instructions violated his entitlement to a "correct statement of the substance of the law,"[115] but must show that it was a "basic, serious, and fundamental"[116] defect, or "clearly show[s] manifest injustice."[117]  We do not think White's assignment of error regarding the order of the instructions constitutes plain error.

"[J]ury instructions must be viewed as a whole."[118]  Even if the instructions contain a few inaccuracies, "this Court will reverse only if such deficiency undermined the ability of the jury "to intelligently perform its duty in reaching a verdict."[119]  A trial court's instruction "will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[120]

---

[114] *Id.*

[115] *Miller v. State*, 224 A.2d 592, 596 (Del. 1966).

[116] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[117] *Id.*

[118] *Jones v. State*, 227 A.3d 1097 (Del. Supr. 2020).

[119] *Probst*, 547 A.2d at 119.

[120] *Id.*

This Court has carefully reviewed the jury instructions. The trial court told the jury it would "describe the crime charged and the essential elements that the State must prove."[121] The trial court carefully reviewed each charge with the jury. The court instructed that each element of an offense must be proven beyond a reasonable doubt:

> You will be required to reach a separate verdict for each offense. Each verdict must be independent of your decision on any other. For each separate charge, if you find that the State has proved all of the elements beyond a reasonable doubt, you should find a defendant or the defendants guilty of that crime. If you find that the State has not proved every element of an offense beyond a reasonable doubt, then you must find a defendant or the defendants not guilty of that crime."[122]

The instructions for each conspiracy count recited, among other specified information for that count, that White, on the listed date, in New Castle County, "*did agree*" with the one or more of the listed persons to "commit said crime" that one or more of them did commit an overt act in furtherance of the conspiracy, and that the defendant or a co-defendant acted intentionally.[123] After setting forth the elements of Conspiracy Second Degree, for example, the court instructed that:

> If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that a defendant or defendants acted in such a manner as to satisfy all of the elements that I have just stated, at or about the date and place stated in the indictment, you should find the defendant or defendants guilty of Conspiracy -- defendant guilty of Conspiracy Second Degree. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Conspiracy Second Degree.[124]

---

[121] App. to Op. Br. at A127 (Jury Instructions).

[122] *Id*.

[123] *Id*. at A138, A143.

[124] *Id*. at A143.

After other general instructions on different points, the trial judge instructed the jury on the separateness of the charges:

> The defendants are each charged with separate offenses that are set forth in the indictment. These are each separate and distinct offenses, and you must independently evaluate each offense. The fact that you reach a conclusion with respect to one offense, or with regard to one defendant, does not mean that the same conclusion will apply to any other charged offense, or to any other charge defendant. Each charge before you is separate and distinct, and you must evaluate evidence as to one offense independently from evidence of each other offense and render a verdict as to each individually.[125]

Then after a few more intervening general instructions, the trial judge instructed the jury on accomplice liability. There is no contention that the instruction was substantively inaccurate. Other general instructions followed, and then the court explained the verdict form. None of the jurors expressed confusion. But White's concern, at least in part, appears to be that the jury was confused and perhaps thought that no agreement would be needed to find White guilty of conspiracy. Put differently, he argues that the jury could have found him guilty of conspiracy even if he acted unilaterally.

"The trial judge is in the best position to assess the risk of any prejudice resulting from trial events."[126] We have, on at least one other occasion, refused to find plain error from jury confusion due to presence of both accomplice and conspiracy instructions when the instructions were accurate statements of the law, the evidence supports the jury's

---

[125] *Id*. at A146.

[126] *Sykes v. State*, 953 A.2d 261, 267 (Del. 2008) (quoting *Brown v. State*, 897 A.2d 748, 752 (Del. 2006)).

findings, and where there was no evidence of jury confusion.[127]  Because he did not raise

it below, we are limited to a review of the record to find support for White's theory of jury

confusion.

We see none.  To the contrary, the record shows that the jury acted with discernment

on this issue, not confusion.  In convicting White on Counts Six and Seven but acquitting

him on Counts Eight and Nine, all of which were Conspiracies Second Degree to commit

Drug Dealing Heroin with different people on different days, the record does not support

White's theory that the jury was confused.  Contrary to White's assertions, the evidence

supports the conclusion that White conspired with others with respect to each of his

conspiracy convictions and we see no risk of jury confusion and no plain error.  Given the

care taken by the trial judge to explain the required elements of the charges, the lack of any

challenge to their substance, and the lack of any evidence of jury confusion, we find no

merit to this claim, let alone plain error.

### C. There Was No Plain Error Regarding The Indictment

White's fourth claim of error is that Count Sixteen sets forth an accusation of

Conspiracy Second Degree to commit a drug dealing offense, but incorporates itself (Count

Sixteen) instead of referring either the prior count or the drug at issue, cocaine (Count

---

[127] *See Turner v. State*, 25 A.3d 774, 776 (Del. Supr. 2011).  The defendant in *Turner* faced charges related to cocaine trafficking, including conspiracy.  *Id*.  Turner argued that "[b]ecause one could aid another without there being any agreement, . . . accomplice liability can be based on a 'lower' level of culpability than conspiracy," and that, "the difference between 'aiding' and 'agreeing' confused the jury."  *Id*.  Because he could point to no language that would support confusion, because the instruction was an accurate statement of the law, and because the evidence presented supported the instruction, we found no error.  *Id*.

Fifteen).[128]  He argues that this clerical error renders the charge defective and void.[129]  We disagree.

In the grand jury's indictment, Count Sixteen charges White with Drug Dealing Cocaine and Count Seventeen alleges Conspiracy Second Degree to commit Count Sixteen.[130]  This indictment contains no circular reference.  But, prior to trial, the Superior Court issued a new indictment under its Rule 7(e), containing 24 charges.[131]  The trial reindictment eliminated Count Twelve and renumbered the subsequent charges.[132]  Count Sixteen retained the same internal numbering, however, and so charges conspiracy to

---

[128] Op. Br. at 31–32.

[129] *See* Oral Argument Video: 19:00 – 19:42, https://livestream.com/accounts/5969852/events/9276126/videos/211529999/player:

> "Count Sixteen in the indictment states this is a conspiracy to commit drug dealing as set forth in count Sixteen.  It usually -- they put the wrong number in the count Sixteen.  It should have been 'Count Sixteen conspiracy to commit drug dealing as set forth in a different count that is a count for drug dealing.  If you look at the count, it doesn't make sense.  You can't say -- you don't know what drug dealing they're talking about because it doesn't relate to a separate count."

[130] App. to Op. Br. at A34 (Indictment).

[131] App. to Reply Br. at AR2–19 (Trial Reindictment).

[132] Count Ten in the grand jury indictment charged aggravated possession of heroin over the period from March 1, 2017 through October 8, 2018. App. to Op. Br. at A31 (Indictment). Counts Eleven through Fifteen were each charges of Conspiracy Second Degree alleging White's conspiracies with different individuals on different dates to commit Count Ten. *Id*. at A31–33. The eliminated Count Twelve alleged that White conspired with Jerome Pritchett on or about August 23, 2017. *Id*. at A32.

commit "Drug Dealing as set forth in Count Sixteen."[133]  The State concedes this error, but

alleges it is "at best a typographical error of no consequence."[134]

Although the written jury instructions stated that Count Sixteen incorporates

"planning or commission of Drug Dealing- Cocaine, as alleged in Count 16,"[135] when

instructing the jury and reading the list of charges, the trial court addressed the

typographical errors as follows:

> "COUNT SIXTEEN is CONSPIRACY SECOND DEGREE, and it reads that DWAYNE WHITE and ERIC LLOYD, on or between the 1st day January 2015, and the 8th day of October, 2018, in this County and State, when intending to promote or facilitate the commission of Drug Dealing as set forth in Count Sixteen, which is -- *I think should read Count Fifteen -- as set forth in Count Fifteen, which is incorporated by reference. . . .*"[136]

Thus, the trial court orally corrected the error when instructing the jury.  Later in the oral

charge, the judge, without reciting the numerical reference for Drug Dealing, instructed the

jury that "CONSPIRACY SECOND DEGREE, Count Sixteen, reads identically to the

Conspiracy instructions I've read to you otherwise except that the specific offense

---

[133] App. to Reply Br. at AR15 (Trial Reindictment).  Though White does not raise it, Count Nineteen of the grand jury indictment, when it became Count Eighteen in the trial indictment, made a similar error and alleges conspiracy to commit "Money Laundering as set forth in Count Eighteen." *Id.* at AR16.  Again, the trial court orally corrected the numbering error.  App. to Op. Br. at A132 (Jury Instructions) ("Count EIGHTEEN is CONSPIRACY SECOND DEGREE, and it reads that ERIC LLOYD and DWAYNE WHITE, . . . when intending to promote or facilitate the Commission of Money Laundering as set forth in Court EIGHTEEN -- but I think that should read COUNT SEVENTEEN -- which is incorporated by reference . . .").

[134] Oral Argument Video: 31:05–32:21.  https://livestream.com/accounts/5969852/events/9276126/videos/211529999/player.

[135] App. to Reply Br. at AR20.

[136] App. to Op. Br. at A132 (Jury Instructions).

identified in Count Sixteen is Drug Dealing Cocaine."[137]  The trial judge is in the best position to assess the risk of any prejudice from trial events.[138]  The judge's oral instruction shows that he was cognizant of the typographical error and on guard against jury confusion.

"The purpose of an indictment is to put the accused on full notice of what he is called upon to defend, and to effectively preclude subsequent prosecution for the same offense."[139]  White does not challenge the accuracy or completeness of the grand jury indictment, which gave him proper notice.  Instead, his argument boils down to the view that a typographical error created by the indictment amendment somehow voids the count.  Because the error was corrected by the trial judge in the presence of the jury, we find no merit to the claim.[140]

### D. The Trial Court Did Not Commit Plain Error In Allowing Testimony from Attorney Benson

White contends that the trial court committed plain error by allowing the State to examine attorney Joseph Benson "in a way that suggested he was the 'go to' attorney for members of the alleged enterprise and that any individual represented by him must have been associated with the alleged enterprise."[141]  White had no objection to portions of

---

[137] App. to Ans. Br. at B1324; *see also* App. to Op. Br. at A144 (Jury Instructions) (emphasis added).

[138] *Sykes*, 953 A.2d at 267 (quoting *Brown v. State*, 897 A.2d 748, 752 (Del. 2006)).

[139] *Dahl v. State*, 926 A.2d 1077, 1081 (Del. 2007).

[140] *See also State v. Blendt*, 120 A.2d 321, 323 (Del. Super. 1956) (rejecting a claim that a typographical error in the indictment failed to put the defendant on notice of the accusation. Superior Court Rule 7(e) permits an amendment of an Information "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.")  Superior Court Crim. R. 7(e).

[141] Op. Br. at 33.

Benson's testimony.[142] But he complains that the State improperly elicited, and the Superior Court improperly admitted, other testimony about Benson having previously represented many of White's codefendants, and that Benson was the registered agent of many of the LLCs at issue in this case.[143] As White characterizes it, that testimony "was not relevant to any issue other than to suggest that Benson was the attorney for the members of the enterprise, and to reinforce the existence of a criminal enterprise based upon his representation of a number of its members."[144] White contends that this testimony improperly suggested to the jury that the exercise of one's constitutional right to counsel may be used as evidence of guilt.

There was no error in admitting this testimony. We agree that evidence that a single attorney represented members of an alleged conspiracy, without more, would have no probative force. But the trial court was cognizant of this concern and instructed the jury as follows:

> This case involved the testimony of a former attorney for one or more of the defendants. A defendant has a constitutional right to an attorney. The fact alone that a defendant, at any time, engaged the services of an attorney may not be considered by you as evidence of guilt in this case. You may, however, consider the testimony of the attorney in evaluating the remainder of the evidence in this case.[145]

---

[142] *See* Op. Br. at 33–34 ("Attorney Benson's direct testimony regarding how material under a protective order was inadvertently provided to his client, Zaire Miller, was not objectionable.").

[143] *Id*. at 33–35.

[144] *Id*. at 35.

[145] App. to Op. Br. at A146 (Jury Instructions).

There is no evidence to suggest that the jury did not follow this instruction.[146]

Although the mere joint representations of alleged co-conspirators has no probative force, "[w]hen other suspicious circumstances are present, the decision of a number of persons to retain the same lawyer may be probative of an association among them."[147] Here, there was more than Benson's mere representation of members of the enterprise. Several witnesses testified that members of the enterprise would hire Benson to represent fellow members charged with crimes.[148] Members of the enterprise would also raise money to pay Benson to represent one of their members. Benson also testified that he was unwittingly listed as the registered agent for an LLC used by Lloyd to launder money.[149] Benson provided a member of the enterprise, Zaire Miller, with discovery material that was under a protective order.[150] The jury also heard a recording of a call between White and Benson during which White inquired about Michael Pritchett's case when Benson was

---

[146] *See Phillips v. State*, 154 A.3d 1146, 1154 (Del. 2017) ("Juries are presumed to follow the trial judge's instructions.") (quoting *Revel v. State*, 956 A.2d 23, 27 (Del. 2008)).

[147] *United States v. Simmons*, 923 F.2d 934, 949 (2d Cir. 1991) (citing *United States v. Castellano*, 610 F.Supp. 1151 (S.D.N.Y. 1985)).

[148] *See* App. to State's Ans. Br. at B608–12 (Testimony of Joseph Benson) (Describing various occasions on which he or his firm represented Dontae Sykes, Tyrone Roane, Michael Pritchett, William Wisher, and Markevis Sanford in criminal matters); *see also United States v. Simmons*, 923 F.2d at 949 (stating that, "[w]e have previously indicated that payment of attorneys' fees by one individual on behalf of other suspected members of a criminal enterprise 'may imply facts about a prior or present relationship' between the benefactor and his beneficiaries," and that, "evidence of such payments is highly relevant to whether the benefactor is the head of a criminal enterprise as defined by the RICO statute.").

[149] App. to Op. Br. at A94 (State's Opening Statement); App. to State's Ans. Br. at B602 (Testimony of Joseph Benson).

[150] App. to State's Ans. Br. at B1228 (Testimony of Det. Barnes).

representing Pritchett.[151]  These facts suggest that the members were linked.  To prove their charge of racketeering, the State had to prove the existence of an enterprise.  This required proof of "any individual, sole proprietorship, partnership, corporation, trust or other legal entity, and any union, association or group of persons associated in fact, although not a legal entity."[152]  Benson's testimony was relevant to this inquiry.[153]  Moreover, we see no unfair prejudice here.  The State is not attempting to suggest that White's exercise of his Sixth Amendment right to counsel is itself indicative of guilt.[154]  Benson's testimony was admissible and relevant and the Superior Court made no error in admitting it.

### E. *The Superior Court Did Not Commit Plain Error In Sentencing White*

For the first time on appeal, White contends that the trial court violated Delaware Supreme Court Administrative Directive No. 76 when it failed to adequately specify the reasons for "imposing sentences so far in excess of SENTAC guidelines . . . [and] application of Section 4204(k)."[155]  He further contends that the Superior Court relied on false factual predicates when it sentenced him.  We reject both claims of plain error.

---

[151] App. to Op. Br. at A112–113.  Benson testified that he was addressing a potential conflict. Benson said, "that was I guess Mr. White asking whether or not I was allowed to remain as Michael Pritchett's attorney or would they -- would that group have to hire another attorney."  *Id*. at 114.

[152] 11 *Del. C.* § 1502.

[153] *See Castellano*, 610 F.Supp. at 1153–54 ("any evidence that tends to show common interests, economic relationships, or a hierarchical structure involving the defendants [and other members of the enterprise] [is] relevant to this element of the [State's] case."); *id*. at 1160 ("When other suspicious circumstances are present, the decision of a number of persons to retain the same lawyer may be probative of an association among them.").

[154] *See United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010) ("The prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial") (quoting *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001)).

[155] Op. Br. at 40.

*1. Administrative Directive No. 76*

On September 15, 1987, the Supreme Court issued Administrative Directive Number 76.[156] That directive implemented the sentencing guidelines that had been developed by SENTAC, and provided, in part, that:

> 2. Any judge who finds a particular sentencing standard inappropriate in a particular case because of the presence of aggravating or mitigating or other relevant factors need not impose a sentence in accordance with the standards **but such judge shall set forth with particularity the reasons for the deviation** . . . (emphasis added).
>
> 3. The sentencing standards are considered voluntary and non-binding; thus, no party to a criminal case has any legal or constitutional right to appeal to any court a statutorily authorized sentence which does not conform to the sentencing standards.

As we have explained:

> This Court's Administrative Directive Number Seventy-Six requires that reasons be given for deviations from SENTAC's sentencing guidelines because this Court *does* have appellate jurisdiction to review criminal sentences on the basis of alleged: unconstitutionality; factual predicates which are either false, impermissible, or lack minimum indicia of reliability; judicial vindictiveness, bias, or sentencing with a "closed mind;" and any other illegality. Except for these constitutional and legal constraints, it is well-established that appellate review of criminal sentences is limited in Delaware to a determination that the sentence is within the statutory limits. Delaware, unlike the federal and several state jurisdictions has not provided for appellate review of criminal punishments that deviate from sentencing guidelines.[157]

---

[156] A260–61.

[157] *Siple v. State*, 701 A.2d 79, 83 (Del. 1997) (emphasis in original) (collecting cases).

Thus, the trial court must explain its reasons for doing so, "*but it is authorized to exceed the SENTAC guidelines without making any factual findings beyond those reflected in the jury's verdict.*"[158]

Prior to imposing sentence, the Superior Court addressed White on the record. Because White challenges the adequacy of the explanation the Court placed on the record, we include that explanation here:

> I've given this case considerable thought, obviously, presided over a number of pretrial motions. I presided over trial. I've conferred with all of the Presentence investigators personally for all three of the defendants, trying to come up with the appropriate sentence in this case.
>
> I have to start off with the fact that you were convicted of very serious crimes, 21, I believe there were, and you'll be sentenced on each of them. The most serious of which, to my mind is the racketeering case, because the State said, and as the statute says, racketeering addresses the business of crime and prohibits the existence of a criminal enterprise. We heard much of that in the trial, and I think by the very nature of the racketeering charge, a lot has come into evidence to explain how communications are made, what's done with profits of crime, et cetera.
>
> And it's true, and I'm taking into account, that as [your attorney] said, in effect, you didn't contest the drug charges, or most of them. It was the attempted murder charge for which you were acquitted, and I take that into account as well.
>
> But I can't overlook the fact that you were instrumental in leading a very, very serious criminal enterprise, where we can only guess at the number of victims of the poison that was spread, the cocaine, the heroin, the - cheapening and worsening of the quality of life in Wilmington and in Delaware because of this large scale, sophisticated, criminal enterprise.

---

[158] *Benge v. State*, 862 A.2d 385, 2004 WL 2743431, at *2 (Del. Nov. 12, 2004) (emphasis added) (TABLE); *see also* 11 *Del. C.* § 4204(n); *Gibson v. State*, 2020 WL 7213227 (Del. Dec. 3, 2020) (TABLE). The explanation requirement ensures the creation of a record susceptible to appellate review. Absent an explanation, a defendant would have no way to challenge a sentence he or she believed was based on one of the enumerated improper grounds.

It's true that you have, quote, just one prior felony, and I'm taking that into account, but I saw so much at trial of the - as the State said in its Sentencing Memorandum - how you operate, how you interact with other people, the huge amount of drugs that were involved in transactions, including, among other people, the William Wisher occasion, the vast amounts of money spent at the Delaware casinos, the bribery charge. And that goes directly to the importance and sanctity of the criminal justice process, the bribing of a witness.

Evasion of tax is serious also, as [the prosecutor] noted, because this was more than just a drug deal or several drug deals, where there was profit to a drug dealer. It was an enterprise, and we carefully defined "enterprise" to the jury.

I do think a sentence over the presumptive guidelines is warranted in this case. And I think, on balance, that the State has not completely, but accurately, set forth the aggravating factors, which includes prior violent criminal conduct, the 2012 Possession with Intent. And the fact that you didn't learn from that offense and kept on going by becoming, especially when Eric Lloyd was in prison, the mover and shaker of this racketeering criminal enterprise.

I do think that now there's some evidence of remorse. The State has said not, but - and I do take into account, as a I said, as I think I should, the fact that you didn't contest the drug charges in the indictment, only the attempted murder cases.

The Conspiracy First Degree charges are very serious, because that was conspiracy to commit murder, and you were found guilty of those.

The bottom line is I think a very significant and severe sentence is required. I don't think that a 70-year sentence is appropriate, as I've tried to strike the balance in this, but I do think that a 50-year sentence is appropriate, and I'm going to impose that.[159]

White asserts that the Superior Court erred by not listing any aggravating circumstances in the sentencing order. The fact that the trial court did not recapitulate its reasoning for the departure on the written order is not grounds for reversal. When departing

---

[159] App to Op. Br. at A251–54 (Sentencing Hearing, Oct. 18, 2019).

from the guidelines, the "factor(s) leading to the exceptional sentence *must* be stated for the record, and *should* be identified in the sentencing order or on the sentencing worksheet."[160] We note the difference between the permissive language ("should") and the mandatory language ("must").[161] The trial court did justify its departures on the record. Having done so, the trial court's decision not to include such a repetition in the sentencing order is not error, let alone plain error.

### 2. *White's Other Challenges to The Superior Court's Sentence Lack Merit*

Next White asserts that the Superior Court "failed to sufficiently cite any aggravating circumstances, except a reference to the State's suggested aggravating circumstances" to support departure.[162] He further argues that "to the extent that the Court adopted the State's aggravating circumstances," they constituted "an insufficient factual predicate."[163]

White then challenges each of the State's suggested grounds for upward departure in turn, arguing that each – prior violent criminal conduct, undue deprecation of offense, lack of remorse, vulnerability of victim, and excessive cruelty -- was based on inadequate factual premises or constituted an error of law.[164] He also asserts that the State's overall

---

[160] *Brochu v. State*, 133 A.3d 558, 2016 WL 690650, at *4 n.28 (Del. Feb. 19, 2016) (TABLE) (quoting SENTAC Benchbook) (emphasis added); *see also* 11 *Del. C.* § 4204(n) ("Whenever a court imposes a sentence inconsistent with the presumptive sentences adopted by the Sentencing Accountability Commission, such court shall set forth on the record its reasons for imposing such penalty.").

[161] *Walls v. State*, 223 A.3d 882, 2019 WL 6690575, at *2 (Del. Dec. 6, 2019) (TABLE).

[162] Op. Br. at 40.

[163] *Id*.

[164] *Id*. at 41–46.

closing argument baselessly blamed White and his enterprise for trends of violence in Wilmington.[165] Lastly, he objects to the Court imposing consecutive sentences for Aggravated Acts of Intimidation and the Conspiracy First Degree pertaining to plot to kill Stanford during his imprisonment when the State, in its request for an overall sentence twenty years longer than the Court imposed, had sought concurrent sentencing on those two crimes.[166] He insists that concurrent rather than consecutive sentences are appropriate in this case.[167] None of White's claims have merit.

First, the Superior Court fully justified its departure from SENTAC Guidelines. White points out that the SENTAC presumptive sentence for Class B felonies is two to five years' incarceration and is up to fifteen months for Class E felonies.[168] The Superior Court imposed sentences longer than these guidelines with respect to five counts. For the Class B felonies of Racketeering,[169] Drug Dealing Heroin,[170] and Aggravated Acts of Intimidation,[171] the Superior Court imposed Level V terms of twenty, ten, and ten years

---

[165] *Id*. at 45–46.

[166] *Id*. at 46–47.

[167] *Id*. at 47 (citing 11 *Del. C.* § 3901(d)).

[168] Op. Br. at 39–40. White's brief misidentifies this as the range for Class *G* felonies, and misidentifies Conspiracy First Degree as such, but this appears to be a typographical mistake.

[169] *See* 11 *Del. C.* § 1504(a) (Racketeering is a Class B felony).

[170] 16 *Del. C.* § 4752(b)

[171] *See* 11 *Del. C.* § 3533 (Aggravated Acts of Intimidation is a Class B felony).

respectively.[172]   The Superior Court imposed five-year sentences for each of the two Conspiracy First Degree charges,[173] Class E felonies.[174]

Additionally, the Superior Court in this case chose to exercise its Title 11, Section 4204(k) authority.[175]   Section 4204(k) permits the sentencing court to require that a specified Level V sentence "be served without benefit of any form of early release, good time, furlough, work release, supervised custody or any other form of reduction or diminution of sentence."[176]   In plain language, the Superior Court may "require a sentence be served day for day."[177]   A Section 4204(k) sentence is treated as a departure from the presumptive guidelines.[178]   Thus, the Superior Court has "traditionally been reluctant to use section § 4204(k) when imposing *any* sentence, and reserves that sanction for appropriate cases, such as ones in which the need for the protection of the public is predominate."[179]   In this case, the Superior Court applied its Section 4204(k) authority to

---

[172] App. to Op. Br. at A254–55 (Sentencing Hearing).

[173] *Id*. at A255.

[174] *See* 11 *Del. C*. § 513 (Conspiracy in the First Degree is a Class E felony).

[175] App. to Op. Br. at A255–56 (Sentencing Hearing).

[176] 11 *Del. C*. § 4204(k)(1).

[177] *State v. Delaware Bd. of Parole*, 2014 WL 595870, at *2 n.12 (Del. Super. Jan. 24, 2014).

[178] *See* App. to Op. Br. at A268 (SENTAC Benchbook 2019) ("imposition of a sentence pursuant to 11 *Del. C.*, sec 4204(k) is, in effect, a departure from the presumptive sentencing guidelines.").

[179] *State v. Lopez-Moncada*, 2015 WL 3508100, at *3 (Del. Super. June 3, 2015) (italics in original).

Bribing a Witness and Attempt to Defeat Tax, mandating two years served at Level V incarceration for each,[180] and to the twenty-year Racketeering sentence.[181]

The Superior Court must exercise its independent judgment in sentencing defendants.[182] The Superior Court's extensive explanation in this case demonstrates that it fulfilled that responsibility. The Superior Court stated its reasons for departing from the SENTAC guidelines, and in doing so, it also stated its reasons for imposing a sentence pursuant to 11 *Del. C.* § 4204(k).[183]

Nor did the Superior Court fail to identify aggravating factors and limit itself to only incorporating the State's memorandum. The trial judge's extensive recitation noted that the State's memorandum was 'accurate' without being 'complete' and identified a number of other aggravating factors supported by the record. The factors enumerated in the SENTAC Benchbook are non-exhaustive,[184] and although the State's sentencing memorandum focused exclusively on them, the trial judge's analysis included other relevant factors.

---

[180] App. to Op. Br. at A255–56 (Sentencing Hearing).

[181] *Id*. at 254.

[182] *See White v. State*, 198 A.3d 176, 2018 WL 6167326, at *3 (Del. Nov. 21, 2018) (TABLE) ("In sentencing [the defendant] above the State's recommended 25-year sentence, the Superior Court stated that it did not lightly set aside the sentencing recommendation that had resulted from the parties' plea negotiations. Nonetheless, after reviewing all of the information. . . the Superior Court *had* to exercise its independent sentencing judgment.") (Emphasis added).

[183] App. to Op. Br. at A252–53; A255–56.

[184] *See* SENTAC Benchbook 2020 at 110 ("The following aggravating and mitigating circumstances for exceptional sentences are provided as examples and are not intended to be exclusive reasons for departure."); SENTAC Benchbook 2019 at 132 (same).

The trial judge repeatedly emphasized the importance of White's leadership role in the enterprise in his decision to impose an above-guideline sentence. Considering White's leadership role in the enterprise was within the sentencing judge's discretion.[185] Moreover, as the Superior Court noted, White reacted to Eric Lloyd's arrest by taking on a *greater* criminal role, demonstrating that he did not learn from Lloyd's experience. The trial court also appropriately noted "the huge amount of drugs that were involved in the transactions," and that "we can only guess at the number of victims of the poison that was spread, the cocaine, the heroin."[186] And the trial judge emphasized that the large-scale narcotics transactions involved enormous sums of money being used in illegal ways—evading taxes, bribing witnesses, and financing an entire criminal enterprise.

In this respect, the trial court's observations on the record complemented and enhanced the arguments made by the State in its memorandum regarding Delaware's narcotics laws. As the State pointed out,[187] in 2011 the General Assembly enacted what it described as a "comprehensive revision" of Delaware's drug laws, the "Ned Carpenter Act."[188] As we have previously noted, the Ned Carpenter Act relaxed the criminal penalties

---

[185] *See, e.g.*, *Lake v. State*, 1984 WL 997111 (Del. Supr. 1984) (stating that a "trial court has wide discretion in making a sentencing determination," and that "[i]ncluded within that discretion is the latitude to consider all information pertaining to a defendant's person history and behavior which is not confined exclusively to conduct for which that defendant was convicted.").

[186] App. to Op. Br. at A252 (Sentencing Hearing, Oct. 18, 2019). In its Sentencing Memorandum, the State stated that White delivered at least 100 logs of fentanyl-laced heroin to William Wisher on a single occasion. *See* App. to Op. Br. at A175 (State's Recommended Sentencing Memorandum); *id*. at A180 (stating that, "[t]he evidence showed White delivered 'super weight' heroin with fentanyl -- sheer poison.").

[187] *Id*. at A180.

[188] 78 Del. Laws ch. 13, §§ 10, 43 (2011).

in the Delaware code in some respects.[189]  But the General Assembly was clear in the preamble to the Act that drug dealing is "a significant threat to society;. . . is significantly associated with violent crime;. . . a substantial percentage of homicides in Delaware are related to drug dealing; and . . . drug dealers who deal in substantial quantities of drugs are a greater threat to society than those who deal in lesser quantities of drugs."  White's course of conduct -- leading a ring of narcotics traffickers who move enormous volumes of narcotics, and leading a group of people who frequently engage in violence against one another, their adversaries, and innocent persons -- is precisely the type of behavior the General Assembly sought to sanction.

Nor do we find merit in White's argument that to the extent the Superior Court adopted the State's aggravating circumstances, there was an insufficient factual predicate justifying reliance on them.  White's prior Possession with Intent to Deliver a Narcotic conviction is a violent felony as defined by the Delaware Code.[190]  The trial court did not rely on that factor to depart upward on any of the lesser offenses.  Offenses for which White was previously arrested but not convicted may be taken into account at sentencing so long as they have "a minimal indicium of reliability and [are] not demonstrably false, and that the defendant has the opportunity to explain or rebut the information."[191]

---

[189] *See Ayala v. State*, 204 A.3d 829, 838-39 nn.46–47 (Del. 2019) (observing that several types of conduct, formerly classified as felonies, were now aggravating factors for other drug misdemeanor and felony offenses).

[190] *See* 11 *Del. C.* § 4201(c) ("The following felonies shall be designated as violent felonies: . . . Title 16, Section 4752 Former Manufacture/Delivery/Possession with Intent to Deliver a Controlled or Counterfeit Controlled Substance.").

[191] *Ferry v. State*, 173 A.3d 1048, 2017 WL 5041470, at *2 (Del. Nov. 1, 2017) (TABLE) (citing *Mayes v. State*, 604 A.2d 839, 843 (Del. 1992) (stating that, "in reviewing a sentence within

Likewise, the trial court is permitted to consider White's lack of remorse for some of his crimes even when, like here, it found that he showed remorse for others. White argues that the SENTAC Benchbook speaks of "total lack of remorse" as an aggravating factor.[192] Although that is accurate, the remorse at issue is with respect to "the offense," not to the offender.[193] The record reflects that the trial court appropriately considered White's mixed record of remorse when it crafted its sentence.

White's attack on the Vulnerability of Victim factor, relating solely to the Bribing a Witness offense, fails as well.[194] White argues that vulnerability applies only if the victim exhibits "extreme youth, advanced age, disability, or ill health," and that Jashown Banner's parents and grandmother are none of those things. But the SENTAC factor is not so limited. Rather, it applies when the "Defendant knew, or should have known, that the victim of the offense was particularly vulnerable *or* incapable of resistance due to extreme youth, advanced age, disability, or ill health."[195] Physical frailty and age are not the only means by which a victim may be vulnerable. With a young child or grandchild recently grievously wounded under such traumatic circumstances, the Court had more than an

---

statutory limits, this Court will not find error of law or abuse of discretion unless it is clear from the record below that a sentence has been imposed on the basis of demonstrably false information lacking a minimal indicium of reliability."); Super. Ct. Crim. R. 32(1)(B)–(C).).

[192] Op. Br. at 43; *see also* SENTAC Benchbook 2020 at 112; SENTAC Benchbook 2019 at 134.

[193] SENTAC Benchbook 2020 at 112; SENTAC Benchbook 2019 at 134.

[194] *See* App. to Op. Br. at A178–79 (State's Recommended Sentencing Memorandum).

[195] SENTAC Benchbook 2020 at 112 (emphasis added); *see also* SENTAC Benchbook 2019 at 134.

adequate basis to find White's attempt at bribery as exploitative of their distressed emotional state.

The trial court was likewise within its discretion to find White's acts satisfied the 'excessive cruelty' factor, which the State argued solely as to Conspiracy First Degree and Aggravated Act of Intimidation. White claims that the only "callousness and cruelty to the victim" suggested in this case is that which was "inherent in the element of the offense."[196] But that is not the case. Conspiracy First Degree requires agreement to commit a Class A felony; even among class A felonies, murder is set apart for more severe sanction.[197] The Court adopted the State's argument that White's efforts to procure Stanford's murder while Stanford was incarcerated were particularly outrageous in a manner exceeding the elements of the offense.[198] Likewise, White obtained sealed paperwork and caused its distribution over the internet accompanied by a witness's wedding pictures, and contacted that witness's wife, a means of witness intimidation shocking to the trial court's conscience over and above the simple elements of the offense.[199] The trial court was well within its discretion to find White's behavior depraved and callous in a manner justifying an upward departure.

---

[196] Op. Br. at 44.

[197] *See* 11 *Del. C.* § 4205(b)(1) (a class A felony is punishable by "not less than 15 years up to life imprisonment to be served at Level V except for conviction of first degree murder in which event § 4209 of this title shall apply.").

[198] App. to Op. Br. at A179.

[199] *Id*.

Lastly, the State asked that sentences for Aggravated Acts of Intimidation and Conspiracy First Degree run concurrently as a component of a seventy-year aggregate sentence of imprisonment.[200] The Court imposed consecutive terms of imprisonment for those offenses as components of a substantially shorter term than the State's recommendation. White's assertion that the Court's deviation from the State's request requires a separate justification, unsupported by case law or any other authority, fails to identify any basis for this Court to find an abuse of the trial court's discretion.[201]

In every respect, the trial court carefully explained on the record its upward departures from SENTAC guidelines. Its sentencing decision relies exclusively on factual predicates supported by the record, and draws conclusions and judgments well within its discretion. Accordingly, we reject White's claims of error.

## III. CONCLUSION

Based upon the foregoing, the judgment of the Superior Court is AFFIRMED.

---

[200] Concurrent sentencing is governed by 11 *Del. C.* § 3901(d). That statute instructs the court when imposing sentences to identify whether the sentence so imposed will be concurrent with any other sentence imposed on the same offender, but does not specify any preference or entitlement to concurrent sentencing. *Id.* Section 3091(d)(1) excludes certain offenses from concurrent sentencing, none of which is implicated here.

[201] The General Assembly requires the trial court to justify a departure from the SENTAC presumptive sentence. 11 *Del. C.* § 4204(n). It has imposed no such requirement on departures from the State's sentencing recommendation.